**UNION DRAWN STEEL CO. et al. v. NATIONAL LABOR RELATIONS BOARD.**

**No. 6983.**

Circuit Court of Appeals, Third Circuit

Jan. 20, 1940.

BIGGS, Circuit Judge, dissenting, in part.

Chauncey E. Wheeler, of Providence, R. I., and Joseph W. Henderson, of Philadelphia, Pa., Thomas F. Patton and Jones, Day, Cockley & Reavis, all of Cleveland, Ohio, and Rawle & Henderson, of Philadelphia, Pa., for petitioners.

Samuel Edes, of Washington, D. C., Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolf, Joseph A. Hoskins, Attys., National Labor Relations Board, and Charles A. Horsky, Sp. Atty., all of Washington, D. C., for respondent.

Before BIGGS, MARIS, and BIDDLE, Circuit Judges.

BIGGS, Circuit Judge.

The National Labor Relations Board has found that the petitioners dominated and interfered with the formation and administration of two labor organizations, viz., Independent Protective Association of Employees of the Union Drawn Steel Plants No. 1 and No. 3, and Employees of Union Drawn Steel Company Plants No. 1 and No. 3;. discouraged membership in other labor organizations, viz., Amalgamated Association of Iron, Steel and Tin Workers of North America and Steel Workers Organizing Committee; and also discriminated in regard to the hire and tenure of two employees, Thomas Eurick and Wilfred Thomas, thereby discouraging membership in the two labor organizations last named. The Board entered an order requiring the petitioners to cease and desist from dominating or interfering with the administration of Independent Protective Association and Employees of Union Drawn Steel Company; from discouraging membership in the Amalgamated Association or in the Steel Workers Organizing

Committee or in any other labor organizations by discriminating in regard to hire and tenure of employment or in any manner coercing their employees or interfering with their rights of self-organization. The Board's order also requires the respondents to withdraw all recognition from Independent Protective Association and Employees of Union Drawn Steel, to reinstate Eurick and Thomas without loss of seniority or other rights, to make them whole as to back pay, and to post the usual notices signifying their compliance with the order.

■ The primary question presented for our determination is whether or not the findings of the Board find support in the record and are not arbitrary or capricious. If supported by substantial evidence, they are conclusive. 49 Stat. 455, Section 10(e), 29 U.S.C.A. § 160(e); National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 300, 59 S. Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965; National Labor Relations Board v. Griswold Manufacturing Company, 3 Cir., 106 F.2d 713; Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 476.

■ The facts disclosed by the record are as follows. Union Drawn Steel Company, the petitioner, was a wholly owned subsidiary of the petitioner Republic Steel Corporation until October 31, 1937. Upon that day all of its assets were transferred to Republic and all of its liabilities were assumed by that company. Dissolution papers were filed with the Secretary of the Commonwealth of Pennsylvania, but the record does not show whether Union's dissolution actually has been effected. The company engages in the manufacture of cold drawn steel and steel stock. Its plants 1 and 3 produce in excess of 3,000 tons of steel a month. About 90% of Union's necessary raw materials are secured outside of Pennsylvania and approximately 80% of its finished products are shipped to points outside that State. There can be no doubt that Union's operations come within the purview of the National Labor Relations Act. See National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604, 59 S.

Ct. 668, 83 L.Ed. 1014, and the decisions there cited. After October 31, 1937, Union's operations were conducted by Republic Steel Corporation, Union's plants and personnel serving as a division of Republic.

Early in May, 1937, the Steel Workers Organizing Committee endeavored to enlist members at Union's plants 1 and 3. Agents of the S. W. O. C. induced Union's employees to strike upon the evening of May 27, 1937. This strike occurred because these employees were in sympathy with a strike already in progress at certain of the Republic plants of Republic Steel Corporation and because Union's employees were dissatisfied with the nature of their employee representation. The strike was unsuccessful, however, and came to an end upon June 28, 1937.

About June 27, 1937, the petitioners caused to be mailed to Union's employees a derogatory letter concerning the C. I. O. with which the S. W. O. C. was affiliated, stating that the C. I. O. was communistic in its nature and anti-social in its tendencies. Each of these letters was accompanied by a pamphlet entitled, "What the Editors are Saying about the Republic Strike". Subsequently other pamphlets were sent by the petitioners to Union's employees. A typical article contained in them stated that Moscow had been assured that the C. I. O. was leading the American people to bolshevism.

While the strike was in progress, vigorous efforts were made by Union's officials to induce its employees to return to work. Eakin, Steffens, Milnes and other employees aided the company officials in this movement. Eakin's and Steffens' efforts in this regard commenced about June 20, and ended with the breaking of the strike on June 28, 1937.

On June 29, Vice-President Creighton of Union heard that the S. W. O. C. was holding meetings throughout the Valley to induce volunteers to come to Beaver Falls to compel the Union's plants to close again. He thereupon got in touch with Williams, Republic's chief of police. Men were recruited by Williams to come to Beaver Falls and these recruits were put under the charge of J. E. Meadows. Meadows came to Beaver Falls from the Trotter Coal Mining Company of Uniontown, Pennsylvania, one of Republic's subsidiary companies. The anticipated violence did not come to pass, but Meadows remained upon

the scene to play a leading part in the events which transpired subsequently.

Meadows stated at the hearings before the Examiner that he had been employed by Union to "look after the welfare of the interest of the employees and of the company as far as seeing that they are not interfered with in their rights as citizens." Upon at least one occasion he represented himself to be a sergeant of Republic's plant police. Upon the stand he proved to be a vague and evasive witness, if not a perjurious one. For this reason it is difficult to describe exactly the basis of his employment. Certain facts stand out, however. Among them are the following.

In the first week of September, 1937 Meadows wrote to the Industrial Defense Association, Inc., of Boston and asked that he be sent a thousand copies of "circulars and other literature you may have for distribution on C. I. O." He received these circulars and, admittedly, distributed them to persons outside Union's plant. He denied distributing the circulars within the plant, but the Board rightly gave small credence to this denial. These pamphlets contained many statements attacking the C. I. O. The following are typical: "The invisible driving force of the C. I. O., with John L. Lewis as its ostensible head, is composed largely of revolutionary outcasts from the slums and gutters of Europe and Asia," and, "In 1920 the Satanical-minded leaders of the U. S. S. R. formed the Red International of Labor Unions, for the purpose of consolidating the ranks of anti-Christian and atheistic elements in skilled and unskilled labor circles. Through its American branch and many subsidiary groups this Red International is responsible for the formation and has furnished the driving force behind the program of the Committee for Industrial Organization * * *"

Prior to the time when the Supreme Court held the National Labor Relations Act constitutional, Union had maintained a representation plan for its employees. Under this plan an annual election was held at which members were elected to represent the employees in their dealings with the management. Eakin and Steffens, to whom we have referred previously, were leaders in this organization. Admittedly, this organization was company-dominated for following the decisions of the Supreme Court, and early in May, 1937, Vice-President Creighton informed Union's employees at a meeting called for that purpose that the National Labor Relations Act prevented the continuance of the representation plan. He also stated that while Union's employees had the right to join any labor organization they desired, none the less it could not be said that the C. I. O. could represent them more successfully than had the abandoned representation plan. Creighton also indicated that another plan would be worked out to take the place of the representation plan. Very soon thereafter, Eakin and Steffens and other employees endeavored to create a labor organization known as the "Security League". Both Eakin and Steffens endeavored to secure members for the League in the plant and during working hours with the apparent approval and assistance of supervisory employees. The League never became fully organized, however. Despite this fact Eakin and Steffens, working during the latter part of June and the early part of July, succeeded in getting a number of Union's employees to "swear out" of the S. W. O. C. by an oath taken before a local magistrate.

At this point Meadows again came actively upon the scene for at the end of the first week in July, he engaged a hall in Beaver Falls for a meeting of Union's employees. The meeting was duly held and was attended by most of the men who had returned to work. The meeting was nominally in charge of Eakin but Meadows seems to have dominated it. He told the workmen of the disadvantages of outside unions and of the advantages of keeping dues at home. He stated that the workmen "should organize with the intentions of creating a brotherly love, love for their fellowmen." He also advised the men present to consult some local attorney so that they might be informed about labor law. After the meeting Meadows spent some time in conferring with employees who subsequently took active part in the creation of the Association.

Eakin, Steffens and others retained local counsel and proceeded to organize the Independent Protective Association. From time to time, meetings were held to organize and to induct members. Meadows attended and administered the oath of membership to some of the members. He did not join the Association himself.

Eakin became the Association's first president. Steffens became one of its incorporators. Its treasurer was Seyler, a chemist who was in charge of Union's

laboratory. Seyler was also one of the incorporators. Another incorporator was Pfleghar, a son of the assistant plant superintendent. The financial secretary of the Association was Watkins, an assistant foreman in the stock room. Burson, another assistant foreman, was also an incorporator. It is obvious that supervisory employees played a substantial part in the Association's organization and subsequent management.

In the light of the foregoing we hold that there was sufficient evidence before the Board to warrant its conclusion that the petitioners dominated and interfered with the formation and administration of the Association and were therefore guilty of engaging in unfair labor practices within the purview of Section 8 (2) of the Act, 29 U.S.C.A. § 158(2). While the petitioners contend that there is not sufficient evidence in the record to support a conclusion that Meadows was instructed by them to take part in either the organization of the Protective Association or that he acted within the scope of his employment in doing so, we think that the record plainly supports the inference that Meadows did what he was hired to do. In view of the personnel of the incorporators and officers of the Protective Association and the activities of Eakin, Steffens and others to which we have referred from time to time, we would conclude, as did the Board, that the Protective Association was but a continuation of the Security League and the earlier representation plan.

What we have just said in regard to the Protective Association is equally applicable to the organization described as "Employees of the Union Drawn Steel Plants, Nos. 1 and 3." This organization is composed largely of the same men who are members of the Protective Association and the "Employees" are the Protective Association in an unincorporated form.

There is more than sufficient evidence to support the conclusion expressed by the Board that the petitioners interfered with the employees' right of self-organization guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157, and have been guilty of unfair labor practices in that regard. We are also of the opinion that the petitioners discouraged membership in the S. W. O. C.

The Board also found that the petitioners showed discrimination as to the hiring and tenure of employment of Thomas Eurick and Wilfred Thomas, thereby discouraging membership in the S. W. O. C. and the Amalgamated Association. Eurick had been employed as a laborer by Union for seventeen years until he went on strike. He was one of the first men to join the S. W. O. C. in Beaver Falls. The strike came to a virtual end on June 28th. Eurick did not try to return to work on that day. He remained upon the picket line from June 29th to July 3d. Though Eurick's age does not appear from the testimony, he seems to have been an elderly man of frail appearance. He is a Croatian by birth and some of his testimony was given through an interpreter. None the less, he seems to have understood the questions which were asked him and to have answered them responsively. The petitioners contend that they could not re-employ Eurick because the slackness of their operations following the strike left no place for his employment. Eurick had worked in the stock room. Rhodes was his foreman. Eurick testified that he tried to gain re-employment for the first time on July 6th and continued his attempts during the days immediately following. He testified in part as follows: "Well, he [Rhodes] told me, I asked him how soon they call me on the job. He said he tried to call me a couple of times, he need a man * * * He said he go up in office and see Mr. Pfleghar [the assistant plant superintendent] and Mr. Belles [the superintendent] and he says they don't want me on the job suppose they see me on the picket line."; "* * * Mr. Pfleghar and Mr. Belles don't want me on the job suppose they see me on the picket line * * *"; and "He [Rhodes] told me Mr. Pfleghar and Mr. Belles, he don't want me on the job any more, I was on the picket line." In respect to a conversation which he said he had with Rhodes at a later date Eurick testified that Rhodes said to him that the mistake he made was going upon the picket line, " * * * the big boss see you, the superintendent see you and all of us see you, and that is the reason you cannot get on the job."

Rhodes testified that he told Eurick nothing more than that he was too old a man to be on the picket line and that he might have his job back when there was work for him to do. He admitted that he could have employed Eurick for five days beginning on June 28th, but stated that had he done so he would have been forced to lay him off thereafter. Rhodes also stated that four men had left his department within a

short time after the plant had commenced operations after the strike. Rhodes testified also that Eurick had been transferred from the stock room to the shipping room twenty-one times between January 1, 1937 and the day of the strike. It appears that three additional men had been placed at work in the shipping department while Eurick was out of employment, but the record does not show whether these were skilled or unskilled workmen. Rhodes testified that he did not have work available for Eurick because "The place was all filled with other men." He testified that the work which had been done by Eurick prior to the strike, after the strike was done by himself and other members of the stock room force.

■ The testimony of Eurick as to what Rhodes said to him is hearsay. In Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L.Ed. 126, the Supreme Court, construing the language of Section 10(b) and 10(e) of the Act, 29 U.S.C.A. § 160(b) and (e), providing that "* * * the rules of evidence prevailing in courts of law or equity shall not be controlling" and "The findings of the Board as to the facts, if supported by evidence, shall be conclusive", points out that the findings of the Board must be supported by substantial evidence and that uncorroborated hearsay or rumor does not constitute such evidence. Moreover, the petitioners contend that Eurick's testimony of Rhodes' statements to him should not be considered by the court in determining whether there was competent, substantial evidence to support the findings of the Board in respect to Eurick. They cite the case of National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 98 F.2d 870, 871, as authority for this proposition. We are of the opinion, however, that the authority cited does not hold that hearsay evidence should be excluded from consideration but merely determined that it should not constitute the sole basis for a fact finding of the Board.

The statements which Rhodes is alleged to have made to Eurick are not remote from the subject of the controversy, and there is corroboration for Eurick's testimony as to Rhodes' conversations in the petitioners' demonstrated hostility to the S. W. O. C. and in the fact that Eurick's place was filled by other men. It was filled because Rhodes himself and other employees of the stock room did the work which Eurick had done before the strike. This appears from Rhodes' testimony itself.

■ The issue presented is clearly one of fact. We cannot state that the finding of the Board to the effect that Eurick was the subject of discrimination as to hire and tenure of employment contrary to the provisions of Section 8(3) of the Act, 29 U.S.C.A. § 158(3), was without substantial evidence to support it.

We come now to the question as to whether that part of the Board's order requiring the reinstatement of Eurick with back pay should be enforced. Had Union filled Eurick's place with another sweeper or laborer, there would be no question but that this portion of the order would be enforceable. The right of the workman to strike is a prime weapon in his economic struggle with the employer, a right recognized by the Act. The right of the employer, for general economic reasons, to make use of a smaller staff to operate his business, to decrease his production, or to go out of business entirely if he desires to do so, we regard as indubitable. For example, if an employer has employed ten men to operate ten machines, he may, for such reasons, employ only nine men to operate the ten machines or he may operate only nine machines with only nine men, or, if he chooses, he may cease all operations. This right must be deemed to be one of the employer's weapons in the general economic struggle.

■ Thus far, the members of this court are in accord. A majority of the court, however, are of the opinion that since Union has assigned the foreman, Rhodes, and the other members of the stock room force to do the work which Eurick had done prior to the strike, no position is at present open to which he can be reinstated. Consequently, they say, the most which the Board may order to be done for Eurick is to require Union to put him upon a preferred list to be employed at the first vacancy. They hold that to enforce the order requiring his reinstatement in the absence of a finding that there is work for him to do which is not being done by men employed before the strike, is in effect to permit the Board to dictate to Union the number of men it shall employ in its business regardless of the amount of work to be done, a power which the National Labor Relations Act has not conferred upon the Board but which remains wholly with the employer

to be exercised in its discretion regardless of motive.

The writer of this opinion is of a somewhat different view in respect to Eurick's status. I do not doubt that an employer possesses the right to go out of business or to decrease his production at any time or for any reason that he sees fit. These weapons remain to him whether he be engaged in a struggle with his competitors or with his employees. His motive in ceasing production or decreasing it is not open to scrutiny and is impertinent to any issue into which the Labor Board is entitled to inquire. To hold otherwise would in fact deprive the employer of the control of his business. I think that it is also equally clear that for any reason save one, he may cause nine men to do the work of ten or, as in the case at bar, direct a foreman and his crew to do the work theretofore done by a laborer, as an incident of their regular duties. The one reason for which the employer may not do these things is that he is moved by a desire to discriminate against his employee in order to encourage or discourage membership in any labor organization. At this point, contrary to the view of a majority of this court, and at this point only do I think that the motive of the employer becomes material, for discrimination involves motive, and there can be no discrimination without a motive for it. If the work is there to be done, the employer may not discriminate in respect to the man who is to do it in order to encourage or discourage union membership. In the case at bar the work of a laborer or sweeper in the stock room remained to be done after the strike precisely as it had to be done before the strike. This is clearly apparent from the record and requires no special finding of the Board. If this work had been done after the strike by, say one John Smith, newly employed for that purpose, who had not been employed by Union prior to the strike, we would all agree that Eurick should be reinstated at once. I think, contrary to the view of the majority of the court, that the fact that Eurick's work was done by Rhodes and members of his force instead of by John Smith, is of no importance for Rhodes and his force did Eurick's work not because of a desire for increased efficiency or to effect a saving in pay-roll expense, but because as may be inferred from the findings of the Board, supported by substantial evidence, they were persuaded or required to do so in order that the employer might discourage member-ship in the S. W. O. C. The refusal of Union to reinstate Eurick was not for general economic reasons, such as increased efficiency or decreasing pay-roll expenditures, but was by way of discrimination to discourage membership in the S. W. O. C. I think that the National Labor Relations Act has deprived the employer of the weapon of this kind of discrimination in the economic struggle with his employee. In my opinion, to hold otherwise, is to sanction a "squeeze-out" system which will operate not because the employer desires increased efficiency or to reduce his operations or his operating costs, but because he desires to discriminate against an employee because of his union activities or as part of a labor struggle. Nor do I deem this the equivalent of telling an employer how he is to run his business. It amounts to no more than requiring an employer to obey the Act and to desist from an unfair labor practice expressly condemned by Section 8(3). I, therefore, must dissent from the majority's view that that part of the Board's order requiring Eurick's reinstatement with back pay should be modified as suggested.

As to Wilfred Thomas, the record shows that he too was a member of the S. W. O. C. and was vice-president of its local lodge. He was also upon the picket line during the strike. Thomas was a skilled workman who had worked at the Union plants for nearly fifteen years. He had been employed variously as a crane operator, a rotary cracker, a flat straightener, and had been a foreman until 1930 when Republic had secured control of Union by the purchase of its stock. At this time the number of foremen had been reduced from ten to two. When the strike was called, Thomas immediately joined it, leaving his shift at ten o'clock in the evening. He testified that he applied for reinstatement on the evening of July 9th, having heard through his brother that Assistant-Superintendent Pfleghar had said that he might come to work the following morning, Saturday. Thomas reached Superintendent Belles by telephone but was told by him that Pfleghar had said nothing about re-employing Thomas; that "* * * he had to take care for the ones that did come back the first week, and business was slow, and that they didn't have anything for me right then, but he would send for me when they needed me." Thomas testified that he was never sent for but that his place was taken by another man, Hornberger, who had been employed

by Union for a much shorter period than himself prior to the strike.

A stipulation entered into by counsel containing the names and occupations of men who were re-employed after the strike and subsequent to July 7, 1937, does not contain Hornberger's name. No evidence corroborating Thomas' statement as to Hornberger's re-employment was offered by the Board, but its counsel contends that the stipulation shows that several men were re-employed to work at jobs which Thomas could have performed. The stipulation is silent as to whether any of the men there listed were re-employed after July 9th arid does not give the dates of their re-employment. No reason appears why this highly relevant information was omitted.

The Board, however, does not base its finding as to discrimination against Thomas upon either the contents of the stipulation or upon the re-employment of Hornberger. Its finding is largely based upon the fact that Farmer, a crane operator, who withdrew from the S. W. O. C. and on July 10th joined the Protective Association, was re-employed by Union on July 12th. Though the record shows clearly that Farmer was reinstated upon July 12th after Thomas had made application for re-employment, it shows also that Farmer had made application for re-employment before Thomas did so and that Farmer's seniority was far greater than Thomas'. According to Farmer's testimony, he applied for re-instatement about 7 A. M. upon July 9th, and at that time was told to report for work upon July 12th. According to the stipulation previously referred to, a number of flat-straighteners were re-employed after July 7th. The Board also found that a helper to a flat-straightener was re-employed by Union on July 15th. The Board does not designate this helper by name, but he was probably the man referred to in the testimony of Henry Lombardo as having started work upon the day that Lombardo himself applied for reinstatement, which was July 15th. We are unable to determine whether or not this unnamed individual is included in the stipulation. Lombardo's own name does not appear in the stipulation, though it clearly appears that he was re-employed after July 7th. In our opinion the state of the record is too indefinite to support even the conclusion expressed by the Board that a helper to a flat-straightener was re-employed on July 15th. It must also be borne in mind that Thomas requested re-employment in his former position, that of a cracker, and not as a straightener or as a helper to a straightener. The stipulation which is supposed to embrace all persons re-employed after July 7th does not show the re-employment of any cracker or of any helper to a flat-straightener.

Under the circumstances, we conclude that the finding of the Board "that work was available on or about July 9th which Thomas could do and that the failure of the petitioners to reinstate him was predicated upon his union membership" is without substantial evidence to support it.

Further questions raised by the petitioners must be disposed of. The petitioners contend that Section 2(c) of the Board's order which requires the petitioners to make payments to relief agencies is beyond its jurisdiction and contrary to law. We approved a similar provision in an order of the Board entered in the case of Republic Steel Corporation v. National Labor Relations Board, supra. As we stated, we think that such a provision is within the discretionary power of the Board and is not unreasonable. See also National Labor Relations Board v. Planters Mfg. Co., 4 Cir., 105 F.2d 750.

The provision of the order requiring the posting of notices by the petitioners by which they shall acknowledge their compliance with the order of the Board is reasonable also. Similar provisions have been approved frequently. See National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 22, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and the decisions of this court in Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254, and National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713.

Nor can we accept the contention that the order of the Board in so far as it is made applicable to Republic is beyond the jurisdiction of the Board. That petitioner in this connection relies on the decision in the case of National Labor Relations Board v. Hopwood Retinning Co., Inc., 2 Cir., 98 F.2d 97. We deem the case cited to be of small assistance to Republic, for as appears from subsequent proceedings, reported in 2 Cir., 104 F.2d 302, the court adjudged both Hopwood Retinning Co., Inc., and its successor corporation guilty of contempt in failing to obey a decree enforcing an order of the Board containing a provision substantially similar to

that now under discussion. Moreover, the order in the case at bar runs not only as to Union, but also specifically as to its successor. Republic was early brought into the proceedings at the close of the morning session upon the first day of the hearings before the Examiner, and was thereafter represented by counsel who made no objection to its inclusion as a party. Republic therefore has had its day in court and may not now say that it is not subject to the Board's order.

Paragraphs (b) and (c) of Section 2 of the order of the Board will be modified as indicated. In all other respects the order is affirmed and a decree enforcing it will be entered.