NATIONAL LABOR RELATIONS BOARD v. ELKLAND LEATHER CO., Inc. (ELK-LAND LEATHER WORKERS ASS'N, Inc., Intervener).

No. 7176.

Circuit Court of Appeals, Third Circuit.
Aug. 21, 1940.

Writ of Certiorari Denied Nov. 18, 1940.

See 61 S.Ct. 170, 85 L.Ed. ——.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Alvin J. Rockwell, Samuel Edes, and Malcolm S. Mason, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

John W. Morgan, of Lynn, Mass., and G. Mason Owlett, of Wellsboro, Pa. (Lawrence M. Kearns, of Lynn, Mass., of counsel and on the brief), for respondent.

Edwin A. Glover, of Knoxville, Pa., for intervenor.

Before MARIS and JONES, Circuit Judges, and BARD, District Judge.

MARIS, Circuit Judge.

The National Labor Relations Board has petitioned 'for the enforcement of its order against the Elkland Leather Company, Inc. That order was based on the Board's findings that the Leather Company had engaged and was engaging in unfair labor practices (1) in interfering, restraining .and coercing its employees in exercising their right of free self-organization, (2) in dominating and interfering with the formation and administration of Elkland Leather Workers' Association, Inc., and (3) by discriminating in regard to the hire and tenure of employment of five employees, Rush Woodbeck, John A. Creeley, Edward Maxwell, Hiram Davis and Elwin Wright, and thereby discouraging membership in a labor organization. Whether these findings are supported by substantial evidence is the principal question for our consideration. In resolving that question we must, as has been repeatedly held, consider the evidence and all inferences arising therefrom in the light most favorable to the Board's findings. We may not consider opposing evidence if it conflicts with other evidence in the record or with. inferences fairly to be drawn therefrom. Nor may we pass upon the credibility of witnesses or the weight or sufficiency of testimony or in any other way usurp the fact finding powers of the Board.

Considering the evidence in this light we find that it supports facts found by the Board which may be summarized briefly as follows. The Leather Company is engaged in the business of tanning hides for sole leather. It is the largest· sole leather producing unit in the country and employs about 1,000 men at its plant in the Borough of Elkland, Tioga County, Pennsylvania. Elkland is a community of about 3,000 persons. Its whole economic life is dependent upon the Leather Company's business, which is practically the town's only industry.. The Leather Company owns about 125 houses which it rents to employees and it builds other houses and sells them to employees on a rental payment plan. A general store in Elkland is controlled by one of the Leather Company's stockholders. Two of its principal officers own the local electric company. By reason of local business activities it is closely and influentially associated with the local bank, the local newspaper and the local tax collector. Its office manager is a member of the borough council. One of its foremen is the burgess and chief of police while another is president of the school board.

In May 1937 a group of the Leather Company's employees met to discuss the formation of a labor organization. They

invited in an organizer of the National Leather Workers' Association, which we shall call the Union, and by the end of May an active campaign for membership in that organization was under way. Almost immediately the Leather Company, in order to discourage membership in the Union, delivered to each employee with his pay check a statement reading as follows:

"You are under no obligation to join any union and cannot be forced to do so as this tannery will always operate as an open shop.

"This company will deal individually with any employee that wishes to do so at any time."

On May 29th the Leather Company laid off Woodbeck and on May 31st Creeley, because of their activity in the organization work of the Union. Union organization activity continued, however, and on June 15th Local No. 37 of the Union was organized. By the next day 461 of the Leather Company's 944 production employees had joined.

Beginning June 16th petitions advocating a local in preference to a national union were circulated throughout the plant by employees during working hours. This was done with the knowledge, approval and support of the Leather Company acting through a number of its foremen, who also urged upon employees the formation of an inside organization. At the same time the Leather Company's opposition to the Union encouraged similar opposition in the community. On June 17th the publisher of the local newspaper drew up an anti-Union manifesto which was signed by 53 persons, including leading business and professional men, printed and mailed to each post office box in the town. It acclaimed the advantages of a local organization, referred to the Union as "interested only in securing dues and assessments for furthering what has all the earmarks of a Communistic regime, and the support of a trouble-making organization," and, urging the workers "to consider well before coming to a decision," it declared that "from a reliable source it is understood that the tannery will shut down before the demands of the C. I. O. will be accepted."

The Leather Company took no steps to disclaim the inference that it was the "reliable source" referred to. On the contrary on June 18th it actually took steps looking toward the shutting down of its operations. On that day it placed in soak (the first step in tanning) a very small number of hides and on the next day discontinued soaking hides altogether. The stoppage of the soak involved a gradual cessation of operations and would result in a shut down of the entire plant after the hides already in soak went through each of the successive processing operations. Within a few days the beam house (where the first operation following the soaking took place) closed, necessitating the layoff of nearly all the single men normally employed there and of a number of men employed in the shipping department whose places were needed for married men transferred from the beam house. Among those laid off at this time were Maxwell, Davis and Wright. They were all three active in the union organization and were laid off because of their activity. This action was calculated both to discourage Union membership and to stimulate community opposition to the Union. Among its results was the running of Union organizers out of town by a group of men led by a Leather Company timekeeper on June 22d and the activity of Justice of the Peace Irons who prepared printed forms for withdrawal from the Union and took the affidavits free of charge of a large number of employees who signed them, some of them being sent to him by Leather Company foremen.

The stoppage of the soak was followed by the holding of a "loyalty" meeting of employees on June 24th as a result of which a committee circulated among the employees a petition which stated that the employees, having "been released or fearing that we will be released from our employment by the company, whereby not only we but the entire community of Elkland * * * have suffered materially * * *, have therefore associated ourselves into the Elkland Leather Workers' Association * * *. We * * * denounce any and all agitation * * * leading or directed toward a severance of the friendly and cooperative associations that have always existed between the company and its management and the employees," and, requesting the Leather Company "to accept this assurance of our loyalty and cooperation," asked that "steps be taken immediately to increase production in the company plant * * *." On June 30th, the day after the vice president and general manager of the Leather Company was informed that more than 650

employees had signed this petition, he directed resumption of the soak operations.

Previously on June 25th the members of the Union had voted to take strike action in order to show the strength of their organization and to halt the demoralization in their ranks resulting from the anti-Union campaign and the discriminatory lay-offs of Union members. An effort was made to arrange a conference with the general manager of the Leather Company on June 26th but before this could be done the Union members learned that further lay-offs, in the cut sole department, had occurred. Believing that the Leather Company was acting in bad faith the Union members walked out on strike at 2 o'clock P. M. on that day. The strike was caused by the Leather Company's unfair labor practices. The strike was still in progress when the hearings before the trial examiner of the Board commenced in September, 1937. An abortive attempt to settle it occurred on July 10th when an agreement was signed providing for the return of the strikers to work. When, upon their attempt to return on July 12th, it became apparent that there was a complete misunderstanding between the parties as to the meaning of the agreement, the strike was resumed.

Meanwhile the Elkland Leather Workers' Association, which had its inception in the circulation in June with the approval and support of the Leather Company of the petitions advocating a local organization and which took definite form with the "restore the soak" petition, was established as a permanent organization following the restoration of the soak. Steps were taken to incorporate it, by-laws were adopted, and officers were elected. A majority of the employees having signed the articles of incorporation, the Leather Company entered into a collective bargaining agreement with the Association on July 13th. The Association thus incorporated and recognized by the Leather Company as collective bargaining agent retained both the name and leadership of the prior group. It was merely a more permanent form of the original organization whose formation had been dominated by the Leather Company.

We think that the foregoing summarized fact findings of the Board sustain the Board's ultimate finding that the Leather Company engaged in unfair labor practices in the three respects already described. The Leather Company argues that its statement of open-shop policy delivered with the pay checks was not unfair. We cannot agree. On the contrary we think that the Board was justified in finding that this statement, issued at the first indication of Union activity, "was manifestly designed to discourage organizational efforts." Nor do we find any merit in the Leather Company's contention that many of the other fact findings of the Board which are summarized above are not supported by substantial evidence. It would serve no useful purpose to recount here the voluminous evidence contained in this record. It is enough to say that our study of the record satisfies us that all the findings are supported by substantial evidence or by inferences reasonably to be drawn therefrom.

Upon these findings the Board ordered the Leather Company to cease and desist from the unfair labor practices in which it was found to have engaged, including giving effect to the contract entered into between it and the Association. In addition, as affirmative action which would effectuate the policies of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Board ordered the Leather Company (a) to withdraw all recognition from and completely disestablish the Association as representative of its employees for collective-bargaining purposes; (b) to offer reinstatement to Maxwell, Davis and Wright, who were discriminatorily laid off, and to make whole these employees for any losses of pay suffered by reason of the discrimination; (c) to make whole Woodbeck and Creeley, who were also discriminatorily laid off for any losses of pay suffered by them from the dates of their respective lay-offs to the date they were offered but refused reinstatement and went out on strike; (d) upon application, to offer to those employees who went out on strike on June 26th and thereafter, including Woodbeck and Creeley, reinstatement to their former or substantially equivalent positions, placing those for whom employment is not immediately available upon a preferred list for employment as it becomes available, and making whole those who are not offered such reinstatement or placement upon a preferential list; and (e) to post and maintain appropriate notices.

The Leather Company and the Association, which was permitted to in-

tervene before the Board and in this court, urges that the provisions directing the withdrawal of recognition from and the disestablishment of the Association are not warranted. We think that under the fact findings this portion of the Board's order was entirely justified. As Mr. Justice Roberts said in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S. Ct. 203, 208, 84 L.Ed. 219; "disestablishment of a bargaining unit previously dominated by the employer may be the only effective way of wiping the slate clean and affording the employes an opportunity to *start afresh in organizing for the adjustment of their relations with the employer.*" Likewise the order to cease and desist giving effect to the contract with the Association was proper under the circumstances. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S. Ct. 569, 84 L.Ed. 799.

■ The provisions for reinstatement and back pay for Maxwell, Davis and Wright, and back pay for Woodbeck and Creeley are appropriate to effectuate the policies of the Act under the findings, which we think are supported by substantial evidence, that they were all discriminatorily laid off. The provisions for reinstatement of all employees who went out on strike are attacked upon several grounds. First it is said that the strike was not caused by the unfair labor practices of the Leather Company. But the Board found that "the Union, faced with the anti-union conduct engaged in and provoked by the respondent, called the strike because it conceived that no other course remained open to it." We cannot say that this finding has no support in the evidence. It is also strongly urged that the strike which began on June 26th was settled by the agreement of July 10th and that the strike resumption on July 12th was consequently a new strike not caused by unfair labor practices. The Board found, however, that while a paper purporting to be an agreement was signed the minds of the parties never met as to its most important provision, the terms upon which the strikers were to be reinstated. The evidence clearly supports this finding. Consequently the Board did not err in holding that the strike in effect after July 12th was not a new strike but a continuation of the one called on June 26th.

■ Finally it is urged that five of the strikers were guilty of violence and should, therefore, not be ordered reinstated. It appears that on July 6th stones were thrown at automobiles of "loyal" employees on their way to the plant and that the five strikers referred to were arrested, charged with rioting, and fined $50 each by the appropriate state tribunal. The Board held that the offenses charged to these employees were not "of sufficient gravity to warrant their exclusion from" the order of reinstatement. We cannot say that in so holding the Board was guilty of an abuse of the discretion committed to it by the act. Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472. We conclude that the Board's order for reinstatement of the strikers was valid and appropriate to effectuate the policies of the Act. Some suggestion is made that the order to post notices is improper in requiring the Leather Company to admit having violated the law. Such an order has been held proper, however. National Labor Relations Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587.

■ One other matter requires brief notice. The procedure in this case involved a hearing before a trial examiner appointed by the Board, an intermediate report by the trial examiner, exceptions thereto and findings of fact and an order by the Board. Certain findings suggested by the trial examiner in his intermediate report to which no exceptions were filed were nevertheless reversed by the Board which made independent findings contrary to them. It is argued that this was error. The argument overlooks the fact that the Act (29 U.S.C.A. § 160(c) imposes upon the Board itself the duty of stating its findings of fact. That duty it may not delegate to a trial examiner, but must treat his intermediate report, as the Board in this case did, as nothing more than a recommendation. International Ass'n of Machinists v. National Labor Relations Board, App.D.C., 110 F.2d 29; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 94 F.2d 671.

A decree will be entered enforcing in full the order of the Board.