BAUDILIO RIVERA, Petitioner, *v.* PUERTO RICO LABOR RELATIONS BOARD, Respondent; TRANSPORTATION AUTHORITY OF PUERTO RICO, Intervener.

No. 9. Argued April 20, 1949.—Decided July 26, 1949.

*Víctor M. Bosch* and *David Curet Cucvas* for petitioner. *Vicente Géigel Polanco, Attorney General, (Luis Negrón Fernández, Former Attorney General,* on the brief), *A. Torres Braschi, Assistant Attorney General, Yamil Galib Frangie, Assistant Attorney General At Large* and *Luis G. Estades,* for respondent. *Víctor Gutiérrez Franqui* and *Lino J. Saldaña* for intervener. *Enrique Cornier Martínez,* Counsel for the Unión de Chóferes, etc.

MR. JUSTICE TODD, JR. delivered the opinion of the Court.

Baudilio Rivera, a chauffeur of the Transportation Authority of Puerto Rico and member of the Unión de Chóferes y Mecánicos Núm. 1 de San Juan y Ramas Anexas, Inc., pleaded "guilty with the right to testify", before the Board of Directors of the Union, of a complaint filed against him by Rafael Rosas, his fellow worker and submarshal of the afore-mentioned Union. In the complaint Rivera was charged with having attacked Rosas, causing him injuries on account of which he had to be confined in a hospital. The Board of Directors of the Union fined Rivera $100 which he had to pay to Rosas to cover hospital expenses. Not having paid the fine within the 30 days granted him, the union expelled him from membership on July 19, 1946. The Transportation Authority was notified of the action taken by the Board of Directors of the Union and, complying with the provisions of the collective agreement existing between the Union and the Transportation Authority, discharged the petitioner on August 1, 1946.

On October 30, 1946 Rivera appealed to the General Assembly of the Union and the order rendered by the Board of Directors was affirmed. Rivera, after requesting that the Board of Directors be disqualified, moved for reconsideration of the agreement of the General Assembly, and the latter, after he bound himself to pay the $100 fine, agreed to give him a last chance and to take him back as a member of the Union.

Months later, when the Transportation Authority asked the Union for candidates for chauffeur, according to the provisions of the collective agreement between them, it rejected Rivera's, whom we shall hereinafter call the petitioner, alleging that his behaviour, known to the Authority from the records of the Grievance and Adjustment Committee, rendered him unsuitable for the position of chauffeur in the Transportation Authority.

On September 12, 1948 the petitioner, relying on § 9 of the Labor Relations Act, that is, Act No. 130 of May 8, 1945, as amended by Act No. 6 of March 7, 1946, complained to the Insular Labor Relations Board charging them—both the Union as well as the Transportation Authority—with certain unfair labor practices. He charged the Union with having violated § 8 (2) (b) and the Transportation Authority, subdivisions (a), (f) and (i) of § 8(1), of the said Act.

The Board appointed a Trial Examiner [1] and the latter held a hearing. Thereafter he rendered a report finding that both the Union and the Authority had incurred in the alleged unfair practices and recommending that the Board issue an order against both entities requiring them to cease and desist from such unfair practices.

The Union accepted the report rendered by the Trial Examiner but not the Transportation Authority which objected to it and asked that the complaint filed against it be dismissed. The Board, relying on the entire record of the case, rendered a decision and order dismissing petitioner's complaint as to both entities.

Feeling aggrieved, petitioner prays this Court to review the final order rendered by the Board.[2]

█ In his first assignment petitioner contends that the Board erred in exonerating the Union from the responsibilities imposed on it by the Trial Examiner in his report, for since the Union had not opposed it, the Board was estopped from taking any action to reverse it. We do not agree with him. The recommendations of a Trial Examiner are not binding on the Board. His duty is to hold public hearings at which parties appear with their witnesses and, at the conclusion of the evidence, to make a detailed report to the Board indicating his recommendation in accordance with the applicable evidence and law. But his report is nothing

---

[1] By order of the Board both cases were consolidated for purposes of hearing and decision.

[2] Section 9 of the Labor Relations Act.

more than a mere recommendation which the Board, according to the Act creating it and to its own rules and regulations has discretion to alter.[3]

The fact that a party does not file an exception to the report rendered by the Trial Examiner does not mean that said report is final and binding on the Board, for it is the Board which is ultimately bound by law to determine whether or not an unfair labor practice took place. *National Labor Relations Bd.* v. *Elkland Leather Co.*, 114 F. 2d 221 (C.C.A. 3, 1940), certiorari denied in 311 U. S. 705; *International Ass'n. Etc.* v. *National Labor R. Board*, 110 F. 2d 29 (C.A., D.C., 1939); *National Labor Relations Board* v. *Oregon Wordsted Co.*, 94 F. 2d 671 (C.C.A. 9, 1938).

As was said in *Elkland Leather Co.*, *supra*, where certain findings of the trial examiner were not excepted to:

". . . Certain findings suggested by the trial examiner in his intermediate report to which no exceptions were filed were nevertheless reversed by the Board which made independent findings contrary to them. It is argued that this was error. The

---

[3] Section 9 (1) (*b*) of the Act provides:

"The testimony taken by said member, agent or agency, or by the Board, in the hearings shall be reduced to writing and shall be filed with the Board. *The Board may, in its discretion,* afterwards *take additional evidence or hear further argument.* If according to all the testimony taken, *the Board is of the opinion* that any person, employer or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the Board shall make its findings of fact and of law and issue its order, and shall cause the same to be served upon such person, employer or labor organization, requiring it to cease and desist from said unfair labor practice and to take such affirmative action as shall effectuate the purpose of this Act, including, but not limited to, reinstatement of employees with or without back pay, the posting or transmittal by mail of appropriate notices, and the termination of collective bargaining contracts in whole or in part; or make any other order against such person, employer, party, or labor organization, that shall effectuate the purposes of this Act. The order may likewise require such person, employer or labor organization to submit a report from time to time showing the extent to which he has complied with the same. *If, according to the testimony taken, the Board is of the opinion that none of the persons mentioned in the complaint has engaged in or is engaging in an unfair labor practice, then the Board shall make its findings of fact and shall issue an order dismissing the complaint."* (Italics ours).

argument overlooks the fact that the Act (29 U.S.C.A. § 160(e)) imposes upon the Board itself the duty of stating its findings of fact. That duty it may not delegate to a trial examiner, but must treat his intermediate report, as the Board in this case did, as nothing more than a recommendation. . . ."

It should be noted that, in accordance with § 10(c) of the National Labor Relations Act as amended by the Taft-Hartley Law, 29 U.S.C.A. § 160(c), at present the report and recommendation of a trial examiner filed with the National Board becomes the order of the Board ". . . if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize. . ." Our Act, nevertheless, has not been amended and the cases cited, interpreting the federal law prior to its amendment by the Taft-Harley Law, are applicable. The first error was not committed.

 In the second error it is alleged that the Board erred in deciding that the Union did not engage in an unfair labor practice when it suspended the petitioner from membership. The petitioner argues that the Union lacked authority to punish him, since he had already been punished by the Grievance and Adjustment Committee of the Authority; that the rules and regulations of the Union did not entitle it to impose a $100 fine on him; that the Union could not discharge him for not having paid the same; and lastly that the discharge was unjustified.

Section 8(2)(b) of the Act, *supra*, provides:

"(2) It shall be an unfair labor practice for a labor organization acting individually or in concert with others.

"(a) . . . . . . . . . .

"(b) To unjustifiably exclude or suspend from the membership of a labor organization any employee in a collective bargaining unit on whose behalf the labor organization has executed an all-union or maintenance of membership agreement. For violation of this subsection, the Board may, in its discretion, order the temporary suspension or the permanent termination of such clause of the collective bargaining contract

that requires all the employees in said bargaining unit, as a condition of employment, to belong to one sole labor organization or that the members of said organization maintain themselves in good standing as members of the same during the life of the contract."

This provision was not included among the unfair labor practices of § 8 (2) of the original Act (Act No. 130 of 1945). Nor was there or is there any similar provision in the Federal Acts, Wagner and Taft-Harley, even though in the latter, when § 8 (29 U.S.C.A. § 158, 1948 Cumulative Annual Pocket Part, p. 18) was amended, paragraph (b) was included, which enumerated for the first time the instances when labor organizations or their agents may engage in unfair labor practices.

Our Act, more comprehensive than the Federal Act, has intended to face a problem which has been the object of many heated discussions in the United States, that is, the ever more powerful control of labor unions over their members and at the same time the reluctance on the part of the government and of the courts to interfere with the internal administration of said unions.[4] Even though the Taft-Hartley Law—which has been repeatedly attacked by labor organizations, apparently does not interfere with the manner in which they may discipline their members by providing in § 8(b) (1) that ". . .this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership

---

[4] For lengthy and most interesting works on this question, see The Internal Affairs of Associations not for Profit by Z. Chafee, Jr., 43 Harv. L. Rev. 993; The Elements of a Fair Trial in Disciplinary Proceedings by Labor Unions, 30 Col. L. Rev. 847; The Control of Labor Through Union Discipline by Miller D. Steever, 16 Cornell L. O. 212; Civil Liberties and the Trade Union by F. R. Witmer, 50 Yale L. J. 621; Disputes Within Trade Unions by W. W. Stafford, 45 Yale L. J. 1248; Equitable Relief Against Deformation and Injuries to Personality by Roscoe Pound, 29 Harv. L. Rev. 640, to pp. 677 et seq.; The Powers of Trade Unions to Discipline Their Members, 96 U. of Pa. L. Rev. 537 and Some Aspects of Employee Democracy Under the Wagner Act by J. M. Murdock, 32 Cornell L. Q. 73.

therein. . .", has in fact limited the consequences of the disciplinary sanction on a member, by abolishing the closed shop and restricting the union shop and providing in § 8(a) (3) in so far as pertinent, that ". . .no employer shall justify any discrimination against an employee for nonmembership in a labor organization. . .if he has reasonable grounds for believing that such membership was. . . terminated for reasons other than the failure of the employee to tender the periodic due . . . required as a condition of . . . retaining membership" in connection with § 8(b) (2) providing that it shall constitute an unfair labor practice on the part of a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3). . . with respect to whom membership in such organization has been. . . terminated on some ground other than his failure to tender the periodic dues. . . uniformly required as a condition of. . . retaining membership."

Section 8 (2) (b) of our Act does not define what constitutes the unjustified exclusion or suspension of an employee from membership of a labor organization. Its determination has been left to the Board by providing in § 7 of the Act, *supra:*

"(a) The Board shall have power in the manner hereinafter provided, to prevent any person from engaging in any of the unfair labor practices enumerated in Section 8. This power shall be exclusive and shall not be affected by any other method of adjustment or prevention."

The reason is obvious. A specialized agency, expert in matters of labor relations, was created to develop and supervise the compliance of the public policy of The People of Puerto Rico expounded in § 1 of the Act. It devolves, therefore, on the Board to decide in the first instance and according to the facts of each particular case, what constitutes an "unjustified expulsion or suspension" pursuant to § 8 (2) (b).

The same Act which created the Board, confers jurisdiction to this Court to enforce or review its final orders, grant-

ing or denying the remedy prayed for. Section 9 (2) (a) and (b) of the Act. But, it was expressly provided in said Section that "the findings of the Board as to the facts, *if supported by the evidence*, shall in like manner be conclusive" in this Court. (Italics ours.) Our intervention as to the findings of fact of the Board is limited to determining whether there is sufficient evidence to support them. As we said in *Labor Relations Board* v. *Namerow*, 69 P.R.R. 77, 81:

".... Only if there were no evidence in the record in support of the findings of fact of the Board, would we be authorized to hold as a matter of law that the findings of fact, and the order based thereon, could not stand."

And to the same effect, *Sunland Biscuit Co.* v. *Minimum Wage Board*, 68 P.R.R. 345; *United States* v. *Morgan*, 307 U. S. 183; *Board* v. *Hearst Publications*, 322 U. S. 111 and *Medo Corp.* v. *Labor Board*, 321 U. S. 678.

■■ We have examined the evidence before the Board and in regard to which the parties stipulated, and, in our judgment, it is sufficient to support its findings of facts, which we have already discussed. Now, the question of law raised by petitioner is to the effect that the Board erred in holding that the Union had authority under Article VI, §§ A and F of its Rules [5] to impose the sanction it did. The Board, in sustaining the decision of the Union, said:

---

[5] Said subdivisions provide:

"Section A: Charges will be preferred, before the Board of Directors, against any member revealing *lack of respect and consideration, offense*, unfair and vicious propaganda *against his fellow workers* and officials or against the Union. To this effect, the Board will investigate the facts and *if such charges are proved, the Board will impose the corresponding sanction according to each particular case and it shall be effective*. The case will be decided on its merits. *Provided* that if the member feels agrieved by the sanction imposed by the Board of Directors or council, he may ask for review of his case before a general assembly."

"Section F: It shall be the duty of all members to have discipline in the Union as well as in the performance of their tasks. It shall be understood that lack of discipline is a violation of the basic principles of this constitution and *is subject to the fine and penalties which the members of the Board of Directors may impose*." (Italics ours).

". . . we believe the Union had authority, within the powers it enjoys as a private society and in harmony with its own rules and regulations, to impose the proper discipline to its members. To believe and find the contrary would be to obstruct or at least not to expedite the adequate organization and discipline of a labor organization and we would be thwarting the main purpose of the Legislature for enacting the Insular Labor Relations Act. A labor organization which is capable of maintaining, in a democratic and orderly manner, discipline among its members, is doing its share to maintain industrial peace. The imposition of reasonable disciplinary measures as well as the demand of responsibility on the part of its members are necessary factors to make the labor organization a responsible and strong entity to serve as an economic tool, truly effective in the maintenance of harmony and understanding between capital and labor. If we should impair the right of a labor organization to take such internal measures as are necessary to keep the highest degree of cohesion, responsibility and discipline among its members, we would not be carrying into effect the purposes of the statute we must enforce. We have already expressed our intention to interfere the least possible in internal questions of labor organizations. This does not mean, nevertheless, that we are giving a free hand to labor organizations so that arbitrarily and within an absolute discretion, they may impose on their members unreasonable measures, with which the latter cannot comply and, as a consequence, that their employments be affected.

"But this is not the case where the labor Union exceeds its discretion and authority. It is one of those cases where the only competent tribunal to determine and impose the sanction did decide which was the sanction that should be imposed on one of its members. And in order for a labor organization to achieve utmost success in collective bargaining and in the main role it must play in the field of production, it should have, unquestionably, the power to control and guide its members, and see that they perform their contractual and ordinary duties. The question of whether the fine imposed on Baudilio Rivera was to be deposited with the moneys of the Union or was to compensate an injured member, is immaterial. If the Union had authority to impose the sanction, it likewise had authority to decide on its use. And, it can not be said that Baudilio Rivera was not given due process as member of the Union, when

he accepted all the facts and did not present any defense. By pleading guilty to the charges Baudilio Rivera submitted voluntarily to the tribunal of his own organization of which he was a member and accepted the charges, and it acted within its jurisdiction in imposing a penalty of one hundred dollars.

"Consequently, Baudilio Rivera should have complied with the duty imposed on him by the Union, and his refusal to obey it or his lack of compliance with the terms thereof, was sufficient ground for the Union to take in law such additional measures as it deemed proper, including his exclusion from membership."

Should we decide, as a matter of law, that the Board erred when it held, based on the grounds expressed by it, that the definitive suspension of the petitioner from membership of the Union was not unjustified?

We are confronted for the first time with the rule or standard which we should establish in order to decide whether the Board erred in deciding what constitutes an "unjustified" suspension or expulsion of an employee from membership of the labor organization to which he belongs. As a question of law we decide that the Board did not err in upholding the authority of the Union, under paragraphs A and F of Article VI of its Rules and Regulations, *supra*, to impose a $100 fine on petitioner and use it to defray the expenses incurred by the fellow worker injured by him. As a matter of fact the evidence showed that petitioner suggested that the fine be used for that purpose and besides accepting the charges made against him, he agreed to pay said fine in part payments of $5.00. It was his attitude of noncompliance with the sanction imposed, notwithstanding his having accepted it, that caused the further action of the Union of suspending him definitively. Nor did the Board err, in our judgment, in deciding that under the afore-mentioned article of the Rules and Regulations the Union could impose that additional penalty. How can the Union enforce its sanctions unless it makes it known to its members that if they do not comply with them they may be suspended or expelled?

On the other hand, the Labor Relations Board is the one called upon to decide what constitutes an unfair labor practice in accordance with the facts proved in each particular case. And it was incumbent on said Board, in the first instance, to decide whether the Union engaged in said unfair practice in this case by "unjustifiedly" expelling petitioner.

We do not mean by this that we hold that in legal questions we are bound by the findings of the Board. We merely hold that in a case such as this in which the determination of whether the Union has engaged in an unfair labor practice is involved, the proved facts (including petitioner's admissions, equivalent to a waiver of his right to challenge the proceedings before the Board, *Strobel* v. *Irving*, 14 N.Y.S. 2d 864) justify the conclusion of the Board, based on the grounds it set forth.

█ Petitioner further contends that the Board erred in deciding that the Transportation Authority did not engage in an unfair labor practice in discharging him from his position.

Subdivision I of Article III of the Collective Agreement between the Union and the Authority provides that:

"Section I.—In all such cases in which the Union decides to expel one of its members, employed in the Authority as chauffeur or shop laborer, the Authority, in compliance with the provisions of Section 'A' of this same article, shall discharge from work said chauffeur or shop laborer, *Provided,* that if the chauffeur or shop laborer shall take an appeal before the Insular Labor Relations Board or any other competent court of justice and the decision of any of these Agencies were adverse to the action taken by the Authority, the Union shall be bound to refund to the Authority the amount of the compensation which the latter might have paid to the plaintiff laborer as result of the final judgment, rendered by the aforementioned agencies."

Sections A reads:

"Section A.—The Authority and the Union agree nct to utilize the services of any chauffeur or shop laborer engaged in

the various activities of the Division of Busses not affiliated with the Union, with the exception of employees classified as Executive and Administrative."

When petitioner was suspended [6] definitively, the Union addressed the Authority as follows:

"We have the pleasure of enclosing copy of a letter sent by this Union to Mr. Baudilio Rivera, suspending him definitively from the rights of the Union for not having complied with the sanction imposed on him by the Board of Directors after finding him guilty of violating the rules and regulations of the Union.

"We inform you of this for *your own knowledge and action.*" (Italics ours).

What other action could the Authority take under the Collective Agreement except discharge petitioner? It was not the Authority's concern, under the facts of this case, to investigate and decide whether the definitive suspension ordered by the Union was justified or not. This task is entrusted to the Board by § 8 (2) (*b*). Now, § 8 (1) (*i*) of the Act provides that it shall constitute an unfair labor practice for an employer to "Fail to employ or reinstate to his former position, or, in the event of its nonexistence, to a substantially equivalent position, an employee who has been discharged in violation of Section 8 (2) (*b*)." This provision presupposes that the Board has decided, under § 8 (2) (*b*), *supra*, that the labor organization unjustifiedly excluded or suspended an employee from membership. We do not believe that it was the legislative intent to grant to an employer, under the facts of the case at bar, the power to investigate and then decide whether the action of the labor organization, with which it has signed a collective agreement based on closed shop, in excluding a member from its membership, was justified or not. We emphasize the fact that we said "under facts of the case at bar" because situations

---

[6] The chairman of the Union testified that definitive suspension was the same as definitive expulsion.

may arise in which the employer is not bound to comply blindly with the petition of the Union, and if it does, it engages in an unfair labor practice. This is specially so when the employer is or may be aware that the action of the Union in not admitting or expelling a member has been in violation of the rights of laborers recognized by the Labor Relations Act. See *Local No. 2880, etc.* v. *National Labor Relations Board,* 158 F. 2d 365 (C.C.A. 9, 1946), cert. granted in 331 U. S. 798 and dismissed on motion of the petitioner in 332 U. S. 845; *Wallace Corp.* v. *Labor Board,* 323 U. S. 248; *National Labor Relations Bd.* v. *American White Cross Lab.,* 160 F. 2d 75 (C.C.A. 2, 1947) ; *Colonie Fibre Co.* v. *National Labor Relations Board,* 163 F. 2d 65 (C.C.A. 2, 1947) ; *Steele* v. *L. & N. R. Co.,* 323 U. S. 192 and *Tunstall* v. *Brotherhood,* 323 U. S. 210 and Annotations in 95 A.L.R. 10; 97 A.L.R. 609; 160 A.L.R. 918; 166 A.L.R. 356 and 172 A.L.R. 1351.

But such is not the situation of the present case. Here the Board decided that, according to the evidence, the Authority discharged the petitioner at the Union's behest and that "said act was predicated on one of the obligations contained in the collective agreement with the Union. If the Authority had acted contrary to the provisions of the agreement with the Union, it was liable to be charged with the commission of other unfair labor practices besides the breaking up or weakening of the relations between itself and the Union." It concluded "that the Authority, in discharging the aforesaid employee on petition of the Union, because of his having lost his status as member in good standing, acted within the administrative faculties and contractual obliga-

---

[7] Compare the comment on our Act in 59 Harv. L. Rev. 976: "*Experience and Experiment in Labor Legislation: Puerto Rico Labor Relations Act*", especially at p. 980, when in referring to the scope of §§ 8 (2) (*b*) and 8 (1) (*i*), it is said:

tions it had, and, said action, did not constitute any violation of § 8 (1) (*i*) of the Act." [7]

Again we decide that the evidence justifies the findings of fact of the Board and that it did not err in its interpretation of § 8(1) (*i*) with reference to § 8(2) (*b*), *supra*.

■ Lastly, petitioner holds that the Board erred in deciding that the Transportation Authority did not engage in an unfair labor practice in refusing to re-employ petitioner when the Assembly of the Union reinstated him as member of the Union. Petitioner's contention is to the effect that the Authority violated the Collective Agreement with the Union and in doing so engaged in an unfair labor practice under § 8 (1) (*f*) of the Act which so provides. In this respect the Board stated as follows:

"By virtue of the collective agreement referred to the Authority should give a trial, for at least 20 days, to every chauffeur sent to it by the Union. There is no the least doubt that this concept of the agreement foresaw cases of employees whose work records were unknown to the Authority and to make sure of the skill, responsibility, service spirit, efficiency and other factors inherent to a new employee, the Authority had 20 days in which to accept or reject and in the latter event, to ask the Union for new candidates. . . .

"It would be unreasonable to believe that Baudilio Rivera had to be tried out by the Authority with respect to the factors we have pointed out when the Authority was already aware of his work record, and, especially when the Grievance and Adjustment Committee, composed of representatives of the Union

"The treatment of exclusion problems by the Puerto Rico Act, giving the Board power to take direct action against the employee organization, is desirable. It has the advantage of placing in the hands of a disinterested administrative board the power to review exclusions from the union. . . . The Puerto Rico approach may be distasteful to labor, since it gives an outside party the power to regulate union admission policies. Insofar as it removes a ground for management excuses for failure to comply with a closed-shop agreement, however, it should be welcomed by unions. On the other hand, *the Act relieves management of the burden of determining the reasonableness of union membership requirements.*" (Italics ours).

and of the Authority had on various occasions tried him and found him guilty of acts and conduct which spoke unfavorably of his efficiency and behavior. Having, as the Authority had, a complete record of Baudilio Rivera during the time he served as chauffeur of the Authority, it did not have to let him prove his acceptability or inefficiency. . . . We do not believe that the case here involves a unilateral action taken by the Authority in impairment of the sound principles of collective bargaining. It cannot be inferred that this is one of those acts inspired for the purpose of encouraging or discouraging activities in favor of or against a certain labor organization, or a purely capricious one. We believe rather that it was one within the reasonable use of discretion, and of the administrative prerogatives and consistent with the collective agreement between the Authority and the Union. Besides, the fact that the Authority immediately asked for a new list, proves its intention of not departing from the channels of the collective agreement, showing the good faith of its action in rejecting the name of the first one. We have not found either, in the entire record of this case, any purpose or intent, on the part of the Authority, to escape from its contractual obligations or to interfere illegally with the rights reserved to the employees under § 4 of the Act."

In our judgment, the Board did not err in arriving at the conclusions afore-mentioned· or in interpreting the scope of the collective agreement. It is also significant that the Union at no time considered that the action of the Authority in rejecting the petitioner constituted a violation of the Collective Agreement and complained against the Union to the Labor Relations Board. On the contrary, when petitioner was rejected by the Authority it submitted other names. The decision of the Board on this point was tantamount to acknowledging that the Authority had either to accept or reject an employee.

The petition herein should be dismissed.

Mr. Justice Negrón Fernández did not participate herein.