**NATIONAL LABOR RELATIONS BOARD
v. MOLTRUP STEEL PRODUCTS CO.**

No. 7631.

Circuit Court of Appeals, Third Circuit.

June 18, 1941.

Gerhard Van Arkel, of Washington, D. C. (Robert B. Watts, General Counsel, Laurence A. Knapp, Associate General Counsel, Ernest A. Gross, Asst. General Counsel, Samuel Edes and Fannie B. Boyls, all of Washington, D.C., on the brief), for petitioner.

Kenneth G. Jackson, of Pittsburgh, Pa. (Earl F. Reed, Charles C. Hewitt, and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., on the brief), for respondent.

Before MARIS and JONES, Circuit Judges, and WALKER, District Judge.

MARIS, Circuit Judge.

The National Labor Relations Board found that Moltrup Steel Products Company, the respondent, had engaged in unfair labor practices of the character defined by subdivisions (1), (2), (3) and (5) of Section 8 of the National Labor Relations Act, 29 U.S.C.A. § 158(1), (2), (3) and (5). It ordered the respondent to cease and desist from these unfair labor practices, to withdraw all recognition from and disestablish two organizations of its employees known as the Independent Brotherhood of Moltrup Steel Workers, Moltrup Steel Products Company of Beaver Falls, Pennsylvania, and the Local Independent Brotherhood of Steel Workers of Moltrup Steel Products Company of Beaver Falls, Pennsylvania, which together we shall call the Brotherhood, upon request to bargain collectively with a labor organization known as the Steel Workers Organizing Committee, which we shall call the S. W. O. C., and if an understanding be reached concerning rates of pay, wages, hours or other conditions of employment to embody such understanding in a signed agreement, to reinstate and make whole five employees discriminated against in respect to hire and tenure and to post and maintain notices. By the present petition this court is asked to enforce the order of the Board.[1] Its enforcement is opposed by the respondent upon grounds which we shall proceed to consider.

I. It is first urged that the order of the Board, directing the reinstatement with back pay of persons named therein upon findings that the discharge of those persons and the refusal to rehire them were unfair labor practices in violation of Section 8(1) and (3) of the Act is contrary to law because the findings upon which it is based are not supported by substantial evidence and because part of the order is for other reasons contrary to law.

The respondent had operated a night shift continuously since the fall of

[1] The Board requests that paragraph 2 (d) of the Board's order, relating to back pay, be modified to conform with the decision in Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, by striking therefrom all provisions for repayment to government relief agencies and to amend paragraph 2(c) of the Board's order dealing with the posting of notices to conform to its present practice so as to read "Post immediately in conspicuous places in each department of the Beaver Falls plant, notices stating: that the respondent will not engage in the conduct from which it was ordered to cease and desist in 1 (a), (b), (c), (d) and (e); etc."

1935. The Board found that on August 6, 1936 the respondent temporarily discontinued the night shift and laid off approximately 45 employees, and that this shut down was intended to serve as a warning to its employees to refrain from S. W. O. C. activity and was used to discriminate against the S. W. O. C. leaders. As supporting this finding the Board found that the respondent's volume of orders in July, 1936 was not appreciably decreased nor was the inventory of stock on hand in that month so increased as to explain the discontinuance of the night shift in August, 1936 upon purely business grounds. In opposing these findings as unsupported the respondent points to evidence to the effect that it shut down the night shift because it was of the opinion that there would be a slump in orders and that it resumed operating the shift when this prognosis proved to be erroneous. Its objection to the Board's finding, however, is in reality to the inferences drawn by the Board from the facts disclosed by the evidence and to the weight given by the Board to testimony of witnesses whose knowledge and credibility the respondent attacks. The weight and credibility of testimony as well as the inferences to be drawn therefrom are for the Board to decide. Our sole duty is to determine whether the inferences thus drawn by the Board may reasonably be drawn from the evidence before it. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. We conclude that the Board's finding that the respondent's discontinuance of the night shift was intended as a warning against participation in the S. W. O. C. was fairly inferable from the evidence. We accordingly turn to the consideration of the cases of the five employees ordered reinstated by the Board.

Matthew Euriech. Euriech was employed by the respondent in November, 1935, as a bar drawing machine operator in the day shift. At that time he was an experienced workman. He was laid off August 6, 1936, having joined the S. W. O. C. on that day. He was reemployed the last week in August with the advice from the respondent's superintendent that "we don't want no labor trouble in here." On September 12, 1936 he was laid off a second time on the ground that there was insufficient work. In that month, however, the respondent hired 20 additional men among whom was at least one inexperienced man assigned to do work similar to that previously performed by Euriech. On September 21, 1936 operation of the night shift was resumed and the respondent employed or reinstated a total of 44 men by November 30, 1936 and by March 1938 approximately fifty additional employees. Seven of the first group and 18 of the latter had no previous experience in the work for which they were engaged. Despite this extensive hiring of men and Euriech's previous satisfactory record as a worker he was not reinstated. In January or February 1937 he began work for the Works Progress Administration. On March 16th he found work with Elwood Steel Corporation, where he is at present employed.

The respondent, relying upon the rulings in Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F. 2d 61 and National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 106 F.2d 263, argues that the Board is without power to order the reinstatement of Euriech because he has obtained substantially equivalent employment since his discharge by the respondent and is, therefore, not an employee of the respondent within the meaning of Section 2(3) of the Act, 29 U.S.C.A. § 152(3). The Board avoided meeting this argument because it found as a fact that Euriech's employment was not substantially equivalent. It found that if Euriech had remained in the respondent's employ his wage scale would be higher than in his present job. The evidence justifies the Board's finding. We note, however, that the force of the cases relied upon by the respondent on this issue has been destroyed by the decision of the Supreme Court in Phelps Dodge Corp. v. National Labor Relations Board, 61 S.Ct. 845, 85 L.Ed. ——, 133 A.L.R. 1217. In that case the Supreme Court held that the Board has the power to order the reinstatement of a discharged worker in order to effectuate the policies of the Act, even though he has obtained substantially equivalent employment.

William A. McGraw. On February 24, 1936 McGraw was employed by the respondent as a punch straightener and worked in the day shift. About the third week in July and the first week in August, 1936 he was warned by his brother-in-law, Geiser, a machine shop foreman in respondent's plant, not to join the S. W. O. C. or he would be fired. He joined the S. W. O. C. August 1, 1936 and talked to others about joining. He was laid off August

5, 1936 and was not rehired. The respondent claims that one reason McGraw was not rehired was that he was incompetent. This is belied by the fact that he was given a raise of 3 cents an hour during the time he was employed and that his foreman testified at the hearing in speaking of his work that "he got onto it pretty fair." The respondent also urges that it has not employed any one to take McGraw's place and relies upon the decision of this court in Union Drawn Steel Co. v. National Labor Relations Board, 109 F.2d 587. In that case we held that the Board had no power to direct reinstatement of an employee in the absence of a finding that there was work for him to do but that it could direct that the employee be placed upon a preferential list for future employment. In the present case, however, the Board found that up to the hearing in March, 1938 the respondent had employed over 90 men, at least 25 of whom had had no experience in the work for which they were engaged. Under such circumstances the suggestion that McGraw was not reinstated because there was no work for him to do is obviously without merit.

Samuel Cain. From 1916 to 1921 Cain worked in the respondent's plant off and on. He worked continuously from May, 1934 until August, 1936, sometimes in the day shift and at other times in the night shift. He operated a drawing room crane and worked in the die room. On July 12, 1936 Cain joined the S. W. O. C. He immediately started upon the work of signing up his co-workers as members and attended mass meetings of the S. W. O. C. On August 6, 1936 he was laid off as a result of the shut down of the night shift. The evidence shows that it was the respondent's customary practice to return the experienced men from the night shift to the day shift when it became necessary temporarily to discontinue the night shift. Cain was not so transferred although four others were. Nor was he reinstated when the respondent began rehiring men. Cain testified that two other men with less years of service than his have been employed to do his work. The respondent seeks to justify its failure to reinstate him on the ground that his work is being performed by men with longer service records than Cain and that in order to reinstate him it would be necessary to lay off these men. Union Drawn Steel Company v. National Labor Relations Board, supra. The Board made no finding on this point, but

did, as we have already indicated, find that at least 90 men, 25 of them without previous experience, were taken on after August 6, 1936.

Lawrence M. Rump. Rump was employed by the respondent December, 1933 in the bar department of the drawing room as a bar drawer. He was transferred back and forth from day to night shift. He joined the S. W. O. C. July 12, 1936. On August 6, 1936 he was laid off with the rest of the night shift. Although several men from the night shift who had less years of service with the respondent than Rump were later reinstated and put in the day shift the respondent failed to reinstate him. As in the case of Euriech the respondent chiefly relies upon its contention that the Board has no power to order reinstatement of Rump because he has obtained substantially equivalent employment since his employment with respondent ceased. He became a paid organizer for the S. W. O. C. in the fall of 1936 and worked as such for almost a year. The Board made no finding on this point but did expressly state in its order that Rump's reinstatement would "effectuate the policies of the Act." Consequently under the decision of the Supreme Court in Phelps Dodge Corp. v. N. L. R. B., supra, the Board's order was valid.

Henry Keppen. Keppen was employed by the respondent in October, 1935 and operated a bar drawing machine in the night shift. He had worked for the respondent on several prior occasions. The plant superintendent expressed himself as satisfied with Keppen's work. On July 12, 1936 Keppen joined the S. W. O. C. Thereafter he entered into the work of signing up members for that organization. He made his membership drive outside the plant before and after working hours.

About July 29, 1936 a foreman, Rutter, told Keppen that the respondent would recognize only its own company union and that the C. I. O. was no good. Rutter also asked Keppen if he had any papers the C. I. O. was circulating and Keppen denied that he did. Keppen was laid off August 6, 1936. In July, 1937, when he asked for his job the superintendent told him he could have no job with the respondent because "You got mixed up with a bunch of radical miners." At that time he filed an application for reinstatement but had not been called by the respondent to return to work at the time of

the hearing. Men originally employed after Keppen have since been reinstated and Keppen's own machine has been in operation. The respondent makes much of the fact that on prior occasions Keppen had quit his job and was, therefore, deemed unreliable. However, he worked continuously from October, 1935 to August, 1936 without any evidence of an intent to quit and the facts are that his discontinuance of work at that time was compulsory and not voluntary. In Keppen's case we think the evidence is clear that his layoff resulted from his union activities and that the refusal to rehire was for the same reason. There is no need to "make" work for him, since his machine is in operation and he has not obtained substantially equivalent employment.

We conclude that the Board's findings of discrimination against Euriech, McGraw, Cain, Rump and Keppen are supported by the evidence and justify its order directing their reinstatement with back pay.

II. The respondent next contends that there is no substantial evidence to support the finding that it dominated and supported the Brotherhood in violation of Section 8 (1) and (2) of the Act and that the order requiring the disestablishment of the Brotherhood is, therefore, invalid.

For a better understanding of this issue it is necessary briefly to review the events which preceded the formation of the Brotherhood. The Board found that in 1934 an Employees Representation Plan, commonly called the E. R. P., was put into operation at the respondent's plant. The plan was similar to that introduced in other steel plants throughout the country following the passage of the National Industrial Recovery Act, 48 Stat. 195. See Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 474. Under the E. R. P. meetings of the employee representatives were called by the management; annual elections took place in the plant during working hours; employees received their regular pay for time spent during working hours in E. R. P. activities. Employer domination and support of the organization was thus quite open. The E. R. P. was, however, not discontinued on July 5, 1935, the effective date of the National Labor Relations Act which prohibited such domination and support. On the contrary an election under the Plan was held as late as November, 1936. When thereafter the employees discontinued the E. R. P., it was done against the protest of the respondent.

In July, 1936 the S. W. O. C., as part of its drive in the steel industry in Beaver Falls, Pennsylvania, undertook to organize the respondent's employees. This drive met with immediate and continuous opposition from the respondent. Employees were warned against affiliation with an outside union by the respondent's president, superintendent and several of its foremen. By May, 1937 the S. W. O. C. claimed to have enrolled a majority of the respondent's production workers and demanded the consequent right to bargain collectively with the respondent as the representative of the employees. Because of their belief that the respondent had refused so to bargain the employees went on strike June 1, 1937. At a prearranged conference with the respondent's officers on June 17, 1937, while the strike was still in progress the S. W. O. C. attempted to settle the differences without success. The Board found that during this conference the respondent's president, Moltrup, stated that the "S. W. O. C. was not 'responsible,' that he had been getting along all right with his employees long before he was approached by the S. W. O. C., that he was satisfied to continue to deal with his employees as he had in the past, and that he was not going to recognize any union." Shortly thereafter the respondent caused a notice to be inserted in a local newspaper that it intended to reopen the plant on June 28th. On that day a scuffle ensued between pickets and armed deputy sheriffs, resulting in the death of one of the pickets. The plant was not reopened on that day but on June 29th and thereafter officials of the respondent held meetings with foremen and a few of the employees during which a back-to-work movement was initiated.

The plant was reopened July 7, 1937, and the S. W. O. C. voted to discontinue the strike within a few days thereafter. As part of the back-to-work movement plans were laid to induce the employees to withdraw from the S. W. O. C. and to organize an inside union. The Board found that on July 10th a number of the respondent's employees who had been active in the back-to-work movement met at the General Brodhead Hotel in Beaver Falls to discuss the formation of such an organization. The rental for the room used was charged to the respondent and paid by it. At the meeting and taking an

active part in the discussion was James Meadows, a sergeant of police of the Republic Steel Corporation, stationed at its Union Drawn plant located in Beaver Falls. Plans were made to form an organization similar to that at Union Drawn Steel Company. A second meeting was to be held on Sunday, July 18th. Meadows suggested the local Elks Club as a meeting place. Meadows and another asked for permission to use the Elks Club and were told the consent of the Club trustees would be necessary. Moltrup, president of the respondent, telephoned McKane, a trustee of the Club, for such consent, which McKane gave. Later McKane informed Moltrup by telephone that the consent was withdrawn. Meadows and a few of the respondent's employees then obtained permission to hold the meeting at the Polish Falcons Hall in Beaver Falls. At this meeting Meadows, who was the principal speaker, attacked John L. Lewis, the C. I. O. and outside unions bitterly, stated that twenty men had agreed to form an independent union, and that no one could join this union unless he first withdrew from the S. W. O. C. by signing a form letter in an alderman's office. Eleven employee representatives were chosen at this meeting. Of these seven had been active in the back-to-work movement.

Meadows and the representatives met and decided to incorporate under the name "Independent Brotherhood of Moltrup Steel Workers, Moltrup Steel Products Company of Beaver Falls, Pennsylvania." At the second meeting of employees held August 1, 1937 Meadows administered an oath or "obligation" to those present. Pending incorporation the organization was called the "Local Independent Brotherhood of Steel Workers of Moltrup Steel Products Company of Beaver Falls, Pennsylvania." The representatives elected at the first meeting acted as the executive committee of the Brotherhood. During the fall of 1937 Moltrup met with this executive committee and informed them that respondent would bargain with any group "as long as they were employees of his plant." He made no demand for proof of the right of the Brotherhood to represent the employees nor was such proof submitted.

■ The active part taken by Meadows in the organization of the Brotherhood has special significance because of the character of his activities in the industry. See Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587, 589, 590. It is significant that Meadows was introduced to Moltrup by Creighton, manager of Union Drawn Steel Company, on July 7th and thereafter took an active and even leading part in the formation of the Brotherhood. The evidence of financial support, of direct interest in the organization of the Brotherhood and of ready acceptance of negotiations with it is sufficient to justify the Board's conclusion that the Brotherhood was under the domination and influence of the respondent. International Ass'n. of Machinists, etc. v. National Labor Relations Board, 311 U. S. 72, 61 S.Ct. 83, 85 L.Ed. 50. The order of disestablishment was, therefore, proper.

III. The final question for our consideration is whether the respondent was guilty of a refusal to bargain collectively with the representatives of its employees in violation of Section 8(5) of the Act.

On May 30, 1937 the respondent employed 271 men in production work. They comprised a unit appropriate for collective bargaining. An examination of the application cards for membership in the S. W. O. C. disclosed that at least 170 of these men had joined the S. W. O. C. before May 30th. On April 26, 1937, representatives of the union met Moltrup, informed him that they represented an overwhelming majority of the production employees and wished to negotiate a collective bargaining agreement. Moltrup refused to treat with them. Two days later Moltrup repeated his refusal in a telephone conversation with a S. W. O. C. representative. The respondent completely ignored a telegram on the same subject sent by the S. W. O. C. and received by the respondent on May 29th. At a subsequent conference on June 17, 1937 the respondent refused to discuss with the representatives of the S. W. O. C. alleged unfair discharges of a number of the respondent's employees, rejected term by term the provisions of a proposed contract, refused to reduce to writing an oral statement of willingness to negotiate with any accredited group of workers and refused to agree to a consent election.

■ There would seem to be no room for doubt that the Board had substantial evidence upon which to base its finding of fact that the respondent refused to bargain collectively with the employees' representatives. The respondent's argument is in the nature of a confession and avoid-

ance. It claims that beginning sometime in March, 1937 and thereafter the S. W. O. C. sought to bargain and procure a contract solely on behalf of those of the respondent's workers who were members of the S. W. O. C. and that the respondent was, therefore, completely justified in demanding a membership list as a prerequisite to entering into collective bargaining with the S. W. O. C. acting on behalf of those employees. This argument, even if meritorious, is not available to the respondent however, since at the meeting of June 17, 1937 representatives of the S. W. O. C. claimed the right to exclusive recognition and in spite of that claim the respondent continued to make the same demand for the membership lists and continued its refusal to bargain.

■■ An employer is of course entitled to proof that a union seeking to enter into collective bargaining represents a majority of his employees. He is not entitled to dictate an arbitrary method of proof, however. National Labor Relations Board v. Dahlstrom Metallic Door Co., 2 Cir., 112 F.2d 756, 757. In view of the respondent's known antagonism to its workers joining an outside union it was but the exercise of reasonable caution for the S. W. O. C. to conceal from the respondent the names of those who had joined it. National Labor Relations Board v. New Era Die Co., 3 Cir., 118 F.2d 500. The S. W. O. C. made two suggestions as to methods for determining whether it represented a majority, each of which was rejected by the respondent. The first was to have a representative of the Board check the S. W. O. C. membership against the respondent's pay roll. The second was to hold a consent election. The respondent's insistence upon the production of the membership list as the sole method of proof was clearly arbitrary under the circumstances and the refusal of the S. W. O. C. to comply with such a demand did not justify the refusal of the respondent to bargain with that organization.

[12] The respondent further takes the position that the order of the Board to bargain collectively with the S. W. O. C. should not be enforced because even if the S. W. O. C. did have a majority in May, 1937, it had lost that majority by March, 1938. The respondent argues that there should be a new determination by the Board that the S. W. O. C. is at present the authorized representative of its pro-

duction employees. At the hearing in March, 1938 the respondent produced 162 production employees as witnesses. Of these 121 testified they had joined and later resigned from the S. W. O. C. and 157 testified that they had joined the Brotherhood. Many testified that the respondent did not influence them in their choice of the Brotherhood as a bargaining representative. In Oughton v. National Labor Relations Board, 118 F.2d 486, this court ruled that where unfair labor practices have taken place which interfere with the employees' free choice of bargaining representatives it is proper for the Board in order to effectuate the purposes of the Act to direct the employer to bargain with the bargaining representative last chosen by the free will of the employees. This decision is controlling upon this issue. See also International Ass'n of Machinists v. National Labor Relations Board, supra. We conclude that the order of the Board directing the respondent to bargain collectively with the S. W. O. C. is proper.

■ A decree enforcing the order of the Board, modified to the extent requested by it, will be entered.