NATIONAL LABOR RELATIONS BOARD
v. BALTIMORE TRANSIT CO. et al.

INDEPENDENT UNION OF TRANSIT EM-
PLOYEES OF BALTIMORE CITY v. NA-
TIONAL LABOR RELATIONS BOARD.

Nos. 5103, 5109.

Circuit Court of Appeals, Fourth Circuit.

Jan. 10, 1944.

Writ of Certiorari Denied Apr. 3, 1944.

See 64 S.Ct. 847.

Earle K. Shawe, Regional Atty., National Labor Relations Board, of Baltimore, Md. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, David Findling, Maurice R. Kraines, and Millard Cass, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for National Labor Relations Board.

Philip B. Perlman, of Baltimore, Md. (Chas. A. Trageser, Harry Troth Gross, J. Stanislaus Cook, and Henry H. Waters, all of Baltimore, Md., on the brief), for Baltimore Transit Co. and Baltimore Coach Co.

Carman, Anderson & Barnes and Harold J. Wolfinger, all of Baltimore, Md., for Independent Union of Transit Employees of Baltimore City.

Joseph Sherbow, Gen. Counsel, Public Service Commission of Maryland, of Baltimore, Md., for Public Service Commission of Maryland, amicus curiae.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These cases involve a petition by the National Labor Relations Board to enforce an order against the Baltimore Transit Company and its subsidiary the Baltimore Coach Company and a petition by the Independent Union of Transit Employees of Baltimore to review and set aside the order. The Board's order requires the Transit Company and the Coach Company to cease and desist from unfair labor practices; to disestablish Independent as collective bargaining agent of their employees and cease giving effect to any contracts with it; to reimburse all employees for dues and fees in Independent checked off

by respondents from their wages since June 2, 1942, the date of issuance of the Board's complaint; to reinstate immediately 9 of the employees discriminated against and to reinstate the tenth upon timely application after his discharge from the United States Army; to make the 9 whole for loss of pay since June 2, 1942, and the tenth for loss of pay, if any, during the period from 5 days after his timely application for reinstatement until an offer of reinstatement by respondents; and to post the usual notices of compliance with the Board's order.

Five questions are presented by the petitions: (1) Whether the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., is applicable to the Transit Company and its subsidiary, to both of which for the sake of brevity we shall hereafter refer as the company; (2) whether the complaint and order of the Board are barred by the doctrine of estoppel; (3) whether the Board's finding of domination by the company of Independent and the disestablishment of that association as a bargaining agent is sustained by the evidence; (4) whether the Board's finding of other unfair labor practices including the discriminatory discharges is so sustained; and (5) whether the order requiring the reimbursement of dues and fees of Independent checked off by the company are proper. We shall discuss these in the order named.

### The Application of the National Labor Relations Act.

The company operates the street railway and bus transportation system serving the City of Baltimore, Md. and its environs. It operates 22 bus lines and some thirty street car lines, including three trackless trolleys, which serve practically every district of the city. At the time of the hearing, it had 1473 vehicles of which 1253 were in active use; and during the first four months of 1942, these vehicles carried 64,488,591 revenue passengers and traveled 12,235,627 vehicle miles. During 1941, they carried 160,050,096 revenue passengers and traveled 34,042,730 vehicle miles. Much of this traffic is intimately connected with industry. The evidence shows that during the morning rush hours, the company carries approximately 100,000 passengers to outlying industrial areas and approximately 90,000 passengers to the heart of the city where wholesale and manufacturing districts are located.

While the vehicles of the company do not cross state lines, there can be no question that they carry to and from work thousands of passengers who are engaged in the production of goods that flow in interstate commerce. Many of the great industrial and manufacturing corporations of the country have plants in the city of Baltimore or vicinity and large numbers of their employees use the cars and buses of the company as a means of getting to and from their work. It appears from the evidence that of 147,000 employees of 47 of the city's largest industrial concerns approximately 45,000 are dependent upon the company's cars and buses for transportation to and from work. These concerns are engaged in interstate commerce on a large scale, bringing into the state annually goods valued at over $271,000,000 and shipping out goods of a value exceeding $500,000,-000. The cars and buses of the company, moreover, carry persons traveling in interstate commerce to and from the stations and wharves of interstate carriers, and transport mail and newspapers moving in interstate commerce. In connection with their operation, the company brings into the state annually large quantities of materials and supplies. Its purchases of machinery and equipment in 1941 from sources outside the state was $2,353,455.96. In the same year it purchased 1,698,280 gallons of gasoline and 313,976 gallons of oil which originally came from without the state and used 138,381,291 kilowatt hours of electricity, which it purchased from a producer that obtained exceeding thirty-nine per cent of its output from beyond the state.

Under such circumstances we think there can be no doubt that the provisions of the act are applicable to the company's business. Not only would the stoppage of its operations as a result of labor strife interfere with the flow in interstate commerce of the materials and supplies which it uses in the business, but such stoppage would seriously cripple and interfere with other businesses engaged in interstate commerce whose workers are transported to and from work on its cars and buses. We can take judicial notice of the fact that Baltimore is in size the seventh city of the United States; that it is a large city in a small state; that its industry is largely engaged in the production of goods for and the transportation of goods in interstate commerce; that the proper functioning of the

industrial life of such a city is dependent to a large extent upon the transportation furnished by its street cars and buses; and that a tie up of this means of transportation would in large measure paralyze the life of the city and greatly hinder and impede the flow of the interstate commerce in which the people of the city are engaged.

■ The test of the Board's jurisdiction under the act is, not whether the operations of the company constitute interstate commerce, but whether a stoppage of its operations by threatened industrial strife would result in substantial interruption to or interference with the free flow of such commerce. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; Newport News Shipbuilding & Dry Dock Co. v. N. L. R. B., 4 Cir., 101 F.2d 841, 843, affirmed on this point 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219. See also Kirschbaum Co. v. Walling, 316 U.S. 517, 521, 62 S.Ct. 1116, 86 L.Ed. 1638; Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82. The purpose of Congress to extend the operation of the act to cover any business whose interruption by labor disputes would interfere with interstate commerce is perfectly clear. The Board is expressly empowered "to prevent any person from engaging in any unfair labor practice * * * affecting commerce." 29 U.S.C. A. § 160(a). And "affecting commerce" is defined by the act to mean "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C.A. § 152 (7). And that such regulation is within the power of Congress is equally clear. As said in Wickard v. Filburn, supra [317 U. S. 111, 63 S.Ct. 89]: "* * * even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress *if it exercises a substantial economic effect on interstate commerce* and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" (Italics supplied.)

■ If Congress may regulate the labor relations of a clothing manufacturer (N. L. R. B. v. Fainblatt, supra), the wages of an elevator operator in a loft building (Kirschbaum Co. v. Walling, supra), or the grain acreage of a farmer (Wickard v. Filburn, supra), because of the effect these may have on interstate commerce, it would be absurd to say that its power does not extend to the labor relations of a street transportation company, upon whose operation the industrial life of a great city extensively engaged in interstate commerce is so largely dependent.

### The Question of Estoppel.

■ We see no merit whatever in the estoppel relied on. The facts are that in the year 1937 a union not involved in the complaint here made a charge to the regional director of the Board that the company had discriminatorily discharged one Brylke in violation of sections 8(1) and (3) of the act. The regional director refused to file a complaint because he was of opinion that the act had no application to the company's business. The Board approved this position and refused to file a complaint against the company. No further proceedings were had on the charge and no complaint was filed by the Board. There was no adjudication by the Board of the question of jurisdiction or any other issue, but merely an administrative determination not to take action; and it is perfectly clear that the Board was not precluded thereby from taking action at a later date, upon a new complaint and a different state of facts, when its jurisdiction had been made clear by intervening decisions of the Supreme Court and it appeared that the act was being violated by the company.

■ Whatever may be the effect of quasi-judicial determinations of administrative agencies (Cf. Arizona Grocery Co. v. Atchison, etc., R. Co., 284 U.S. 370, 389, 52 S.Ct. 183, 76 L.Ed. 348), it is well settled that the principle of res adjudicata has no application to their exercise of other powers. 30 Am.Jur. p. 930; Pearson v. Williams, 202 U.S. 281, 26 S.Ct. 608, 50 L.Ed. 1029; Tagg Bros. & Moorehead v. United States, 280 U.S. 420, 445, 50 S.Ct. 220, 74 L.Ed. 524; State Corp. Comm. v. Wichita Gas Co., 290 U.S. 561, 569, 54 S.

Ct. 321, 78 L.Ed. 500; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 64, 56 S.Ct. 720, 80 L.Ed. 1033. An administrative agency, charged with the protection of the public interest, is certainly not precluded from taking appropriate action to that end because of mistaken action on its part in the past. Cf. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S. Ct. 437, 84 L.Ed. 656; Houghton v. Payne, 194 U.S. 88, 100, 24 S.Ct. 590, 48 L.Ed. 888. Nor can the principles of equitable estoppel be applied to deprive the public of the protection of a statute because of mistaken action or lack of action on the part of public officials. United States v. San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L. Ed. 1050; Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; United States v. City of ·Greenville, 4 Cir., 118 F.2d 963, 966.

The fact that the Board had taken the position in 1937 that the company was not subject to its jurisdiction was not a matter precluding action but one to be considered in determining what action would be appropriate to wipe out the effect of the unfair labor practices found to exist. In consideration of its prior position, the Board limited the back pay awards in the case of discriminatory discharges, and the refund of dues paid to the company dominated union, to the period subsequent to its filing of the complaint herein against the company. The date of the filing of the complaint was the time when the company was notified that the Board was no longer adhering to the position taken in 1937 that it was without jurisdiction of unfair labor practices by the company; and there is nothing unreasonable in requiring the company to take action to undo the effect of unfair labor practices allowed to continue after that date.

### The Company Union

 Independent was the successor of a company union organized in 1918 under the sponsorship of the company, which throughout its existence had received substantial direct and indirect financial and other assistance from the company. The governing rules of the original organization were subject to the approval of the company's officials who participated directly in its affairs. After the decision in the Jones & Laughlin case in 1937, Independent was organized by members of the governing board of the old company union and the assets of that organization were transferred to it. Some changes were made in the governing rules and organization and direct financial contributions by the company were eliminated; but it was emphasized in the election at which Independent was selected as bargaining agent that it was to be a successor of the old company union, that the assets of the latter were to be transferred to it, and that the existing rights of members of the old company union would not be jeopardized. After the organization of Independent, its officers, other than its secretary, were paid their regular wages by the company for the time that they were engaged in union affairs, although performing no services for the company at the time. The president and certain other officers of Independent ceased to perform their regular duties as employees of the company upon election by the union and devoted their entire time to its affairs but were nevertheless paid their regular wages by the company. After leaving office a number of the presidents were promoted by the company to supervisory positions. Meetings of the governing board of Independent and its committees and elections of the organization were held on company time and property; the facilities of the company were used in mimeographing its financial statements and making announcements to its members; and the company financed picnics for Independent and paid the expenses of its officers on pleasure trips and in lobbying before legislative bodies. After the entry of the Board's order Independent was dissolved and its assets were turned over to the company to hold and distribute among its members. In the light of these facts, there can be no question but that the findings of the Board as to company domination and the order requiring disestablishment were proper. N. L. R. B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; Virginia Electric & Power Co. v. N. L. R. B., 4 Cir., 132 F.2d 390, affirmed 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568; American Enka Corp. v. N. L. R. B., 4 Cir., 119 F.2d 60. The order, having been entered prior to the dissolution of Independent, should be ordered enforced, notwithstanding the dissolution, to bar any attempted revival; and the findings are material, not only with respect to this portion of the order but also with respect to the

provision for reimbursement of dues. We cannot, therefore, treat the question of company domination of Independent as moot because of the dissolution of that union.

### Discriminatory Discharges and Other Unfair Labor Practices.

■ The findings of the Board as to anti-union activities on the part of the company and as to discriminatory discharges of employees are amply sustained by the evidence, which is analyzed in the intermediate report of the trial examiner and which we need not set out here. There was evidence which, if believed, showed anti-union statements on the part of supervisory employees for the purpose of influencing employees against joining an outside union, questioning of employees with regard to union membership by their superiors, spying upon union activities, and persecution and discharge of employees engaged in an attempt to organize an outside union. Much of this testimony is contradicted and we are asked to draw inferences from it different from those that the Board has drawn; but it is too well settled for discussion that these are matters for the Board and not for us.

■ With respect to the discharges, it appeared that all of the men discharged were prominent in the effort to organize an outside union. Most of them had long records of satisfactory service and they testify that the service immediately prior to discharge was of the same sort that they had been rendering through the years of their employment. There is evidence that upon their union activity becoming known they were subjected to unusual surveillance by supervisory employees and numerous complaints of violations of rules were made against them. Violation of rules or insubordinate conduct were the grounds given for the discharges; but the Board found that activity in behalf of the organization of an outside union was the real reason, and we cannot say that its finding lacks support in the evidence. The general pattern followed in the surveillance and complaints, the fact that most of the employees discharged had long records of satisfactory service and that the grounds of discharge were not grounds upon which employees had ordinarily been discharged in the past, the anti-union expressions used by supervisory employees to some of the employees discharged and the general attitude of hostility to an outside union lend strong support to the Board's findings. The questions involved are pure questions of fact; and it is not our function to pass upon the credibility of witnesses or weigh the evidence upon which the Board acted where, as here, it amounts to substantial evidence in support of the findings. Piedmont Shirt Co. v. N. L. R. B., 4 Cir., 138 F.2d 738; N. L. R. B. v. Blue Bell Globe Mfg. Co., 4 Cir., 120 F.2d 974; Hartsell Mills Co. v. N. L. R. B., 4 Cir., 111 F.2d 291, 293. The rule applicable is thus stated in the last cited case: "It must be remembered, in this connection, that the question involved is a pure question of fact; that, in passing upon it, the Board may give consideration to circumstantial evidence as well as to that which is direct; that direct evidence of a purpose to violate the statute is rarely obtainable; and that where the finding of the Board is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn, it is binding upon the courts, as they are without power to find facts or to substitute their judgment for that of the Board."

■ In the case of the employee Flaherty, the company contends that he resigned his position and was not discharged. The special examiner found that he was discharged, and there is evidence to support the finding. The Board found it unnecessary to resolve the conflict in the evidence regarding the matter on the ground that, if he did resign, his resignation was forced by the planned accumulation of complaints against him in accordance with the technique followed in other cases of discrimination. It is to be noted that, two weeks after the discharge or resignation of this employee, he requested reemployment and was told that the company would not reemploy him if he were "the last man on earth". We cannot say that the Board's finding that Flaherty's loss of employment was due either to his discharge or to forced resignation on account of union activities is not supported by the evidence. Cf. N. L. R. B. v. Moltrup Steel Products Co., 3 Cir., 121 F.2d 612, 616; N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 757; Continental Oil Co. v. N. L. R. B., 10 Cir., 113 F.2d 473, 485; Clover Fork Coal Co. v. N. L. R. B., 6 Cir., 97 F.2d 331, 335.

### Reimbursement of Dues.

■ The Board ordered the company to reimburse its employees for dues of the company union withheld from their pay

under the checkoff provisions of the contract between the union and the company, from June 2, 1942, the date of the filing of the Board's complaint. These dues amount to approximately $50,000, but the company received from the union upon its dissolution approximately $35,000, which upon the familiar first in first out principle must be held to be from dues received during the year. This fund the company has agreed to distribute to the employees, and at the hearing before us the Board conceded that this should be credited upon the reimbursement of dues ordered. This means that the only reimbursement required under the order will be as to the remaining $15,000, and we see no reason why the order should not be enforced with respect thereto. The reimbursement has been found by the Board to be necessary to wipe out the effect of the unfair labor practice involved in deducting dues from the wages of employees and paying them to a company dominated union. The employees will not receive more than was taken from them as a result of the unfair practice; and, under such circumstances, we understand that the propriety of the order is a matter for the Board and not for us. As said by the Supreme Court in the recent case of Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 543, 544, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568:

"The instant reimbursement order is not a redress for a private wrong. Like a back pay order it does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices. In this, both these types of monetary awards somewhat resemble compensation for private injury, but it must be constantly remembered that both are remedies created by statute—the one explicitly and the other implicitly in the concept of effectuation of the policies of the Act—which are designed to aid in achieving the elimination of industrial conflict. They vindicate public, not private, rights. Cf. Agwilines, Inc. v. Labor Board, 5 Cir., 87 F.2d 146, 150, 151; Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. For this reason it is erroneous to characterize this reimbursement order as penal or as the adjudication of a mass tort. It is equally wrong to fetter the Board's discretion by compelling it to observe conventional common law or chancery principles in fashioning such an order, or to force it to inquire into the amount of damages actually sus-

tained. Whether and to what extent such matters should be considered is a complex problem for the Board to decide in the light of its administrative experience and knowledge. The Board has here determined that the employees suffered a definite loss in the amount of the dues deducted from their wages and that the effectuation of the policies of the Act requires reimbursement of those dues in full. We cannot say this considered judgment does not effectuate the statutory purpose.

"The argument that the employees received some value from their contributions via the check-off to the Company-dominated I. O. E., is based upon the assumption that such an organization necessarily gives some quid pro quo. But in view of the purposes of the Act, a contrary assumption, that employees receive no benefit from a type of organization which Congress has characterized as detrimental to the interests of employees and provocative of industrial unrest is possible. These are considerations for the Board to decide according to its reasoned judgment. We hold that the Board here made an allowable judgment. That judgment cannot be upset by pointing to substantial wage increases which the I. O. E. was granted. As the court below said, 'it is manifestly impossible to say that greater benefits might not have been secured if the freedom of choice of a bargaining agent had not been interfered with.' 132 F.2d at page 398. Cf. Texas & New Orleans R. Co. v. Railway Clerks, 281 U.S. 548, 559, 50 S.Ct. 427, 430, 74 L.Ed. 1034.

"This reimbursement order cannot be labelled 'penal.' The purpose of the order is not to penalize the company by requiring repayment of sums it did not retain in its treasury. Those sums did go into the treasury of the Company's creature to accomplish purposes the Company evidently believed to be to its advantage, and the order of reimbursement is intended to remove the effects of this unfair labor practice by restoring to the employees what would not have been taken from them if the Company had not contravened the Act. This is not a case in which the Board has ordered the payment of sums to third parties, or has made employees more than whole. Cf. Republic Steel Corp. v. Labor Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. The fact that the Board may only have approximated its efforts to make the employees whole, because of asserted benefits of dubious and unascertainable nature flowing from the I. O. E. does not convert

this reimbursement order into the imposition of a penalty. Cf. Overnight Motor Co. v. Missel, 316 U.S. 572, 583, 584, 62 S.Ct. 1216, 1222, 1223, 86 L.Ed. 1682.

■ It is argued that there was no closed shop contract here such as existed in the Virginia Electric & Power case. This is true, but it is also true that circumstances disclosed by the evidence here practically made membership in Independent compulsory. Only three of the several thousand employees of the company were not members; and, as is well said in the Board's brief: "The employees' only real choice if they wished to act as a group concerning their wages, hours, and working conditions, was to join and remain in Independent, the instrument by which respondents effectively defeated the free exercise of the employees' rights under the Act —and with such membership automatically went a check-off of their dues." Furthermore, we do not understand from the reasoning of the Supreme Court above quoted that the power to order reimbursement of checked off dues is dependent upon the involuntary nature of the payment, as in the case of the closed shop where the employee must pay the dues to retain his employment, but upon the power of the Board to take action to remove the effects of an unfair labor practice. Such action may be as necessary in a case of this kind as in one where a closed shop contract is involved. Here as there it merely "returns to the employees what has been taken from them to support an organization not of their free choice and places the burden upon the company whose unfair labor practices brought about the situation"; and here, as there, the deduction of dues from wages is "not unlike a loss occasioned by a discriminatory discharge" and the order of reimbursement "promotes the policies of the act in substantially the same manner as would a back pay award."

■ The company requests renewed consideration of a motion previously denied by the Court on October 5, 1943, to stay proceedings on the ground that a proviso attached to the Board's current appropriation precludes the Board from asking inforcement of its order in this Court. We think now, as we thought then, that the contention is so lacking in merit as not to warrant discussion. See, however, N. L. R. B. v. Elvine Knitting Mills, Inc., 2 Cir., 138 F.2d 633, decided Oct. 26, 1943. It is

manifest that a limitation upon spending by the Board may not be construed as a limitation upon the jurisdiction of this Court to enforce a Board order.

The order of the Board will be modified so as to give the company credit upon the reimbursement of dues ordered for the funds received from Independent which it shall disburse to its employees; and, as so modified, it will be enforced.

Modified and enforced.